The case is Fairfield Child v. Arrowpoint. The case is Fairfield Child v. Arrowpoint. I'm Steve Mawson. This is Krystal Monchek. I'm with the National Union Fire Insurance Company of Pittsburgh, Pennsylvania. This case is about one issue. Whether a lawyer's agreement, whether that agreement is verbal, in writing, by handshake, or otherwise, truly has any meaning at all. Based on the record below and the ruling by the trial court, agreements don't matter. Rather, all that matters is the collection of an attorney's fee. This should not be so. This case isn't about National Union's duty to defend. National Union does not dispute it had a duty to defend. It, in fact, defended Fairchild in the underlying profiler litigation. It fulfilled that duty to defend. It paid $750,000 to defend Fairchild in the profiler litigation. It also indemnified Fairchild. It contributed to a settlement to resolve the underlying litigation. The issue before this court is one that Schoff and Weiss agreed to resolve with National Union not once, but twice. These fees were addressed at a mediation in January of 2009 at which Fairchild met with its insurance companies. A mediation at which Schoff and Weiss participated as Fairchild's counsel. At that mediation, National Union and Schoff and Weiss agreed that with respect to fees that had been incurred through December 31, 2008, National Union would pay $268,000 to resolve any outstanding disputes as to what was owed. In accordance with this agreement, National Union paid these sums to Schoff and Weiss, and a settlement agreement signed by Fairchild and National Union was executed. Now, Fairchild and his attorneys feel that this agreement doesn't count because it wasn't signed by all of the insurers. But this wasn't the only time this issue was addressed and resolved. While the profiler litigation was stayed during Fairchild's bankruptcy proceedings, the insurers reached a global resolution of the underlying litigation. In conjunction with reaching this resolution, the fees that were owed to Schoff and Weiss again were raised. Again, National Union reached agreement with Schoff and Weiss to resolve these fees and paid in accordance with its agreement. In accordance with this agreement, Fairchild's liquidating trustee represented to the bankruptcy court that it would sign a settlement agreement and release that reflected resolution of all of these issues and also called for dismissal with prejudice of the current litigation pending before the court. After those proceedings were had, Fairchild, not its liquidating trustee, who was then the owner of or entitled to the proceeds of the policies, moved for summary judgment and its attorneys petitioned to have their attorney liens enforced. These agreements do count. Notice of the bankruptcy proceedings of Fairchild's attorneys is not the issue before this court, but it was the issue that was the basis of the trial court's ruling. National Union respectfully submits that its duty to defend doesn't turn on the notice that these attorneys received, turns on the terms of the policy and the allegations of the underlying complaints. With respect to the attorney lien statute, there was nothing that Fairchild recovered in this litigation. National Union paid and Fairchild's insurers paid to resolve separate litigation, court litigation that had been brought against DME Millicron and Fairchild. It was in that litigation that was settled. There was nothing paid to Fairchild, and there are no proceeds of this litigation for which a lien would attach. Also, Mr. Nestor was not counseled for Fairchild in those underlying tort litigation. The duty to defend does not extend to include costs for coverage counsel and to pursue a declaratory judgment action. Again, rather than recognize these facts, the trial court ruled in Fairchild and its attorneys' favor, based solely on the notice that was received regarding the bankruptcy proceeds. If this was the issue and what they were entitled to, this is an issue for the bankruptcy court, not for this court. Agreements do mean something, and they should have meaning. Professionally, ethically, as a matter of law, trial court's order teaches us that these agreements don't matter. Therefore, we respectfully request that this court reverse the trial court's decision. Thank you. Good morning. Good morning, Your Honor. Can I please report I'm Brian Friedman. I represent Brian Friedman. I represent Arrowwood. It's appealing. What we're talking about is an attorney's lien, and it's important to understand first what the cases are. There were a series of underlying personal injury suits in which Fairchild was named as a defendant, and Shoffman Weiss was retained to represent. Those suits are not the case that's here. The case that's here is the later declaratory judgment seeking insurance coverage, out of which this attorney's lien claim arises. I think it's important, since we're talking about a lien, that we follow the money. The petitioners, the attorneys, Shoffman Weiss, who were the defense counsel in the underlying plaintiffs' complaints, and Nestor Constance, who was counsel in this D.J. case, assert a lien against payments that Arrowwood made. So who did Arrowwood pay? Two places Arrowwood sent payments to. One was to Shoffman Weiss, where we deduct money from the payments that he sent to the attorneys to pay the attorneys. It makes no sense. The other payments were to the plaintiffs in the underlying actions, not to Fairchild, not to these attorneys' clients. They went to the plaintiffs. And what the petitioners are saying is that we should have deducted money from those settlement payments to the plaintiffs, taken that money out of the plaintiffs' mouths, and given it to them, the defense counsel. That is the crux of what this petition is about, and that is why the circuit court should be reversed. The plaintiffs, the profiled plaintiffs, agreed to pay their own interests, and those plaintiffs' attorneys certainly should have been paid out of those proceeds of the settlement. That's the way contingency fees work. But plaintiffs don't pay for defense counsels. The only other way to say it would be to say that they were saying we should have paid them on top of the settlements, but that is not what the petition has allowed. The petition is we should have held back money from the settlement payments to pay them, that the plaintiffs in the underlying lawsuits should have paid not only their attorneys, but defense counsel. That's a bad policy. It doesn't make sense for litigation. It would make it impossible to settle any personal injury case if the defendant's attorney could hold up the settlement to get paid out of the settlement payments. I also want to talk about the money that was paid. Chopton-Weiss did not go uncompensated. The money that Chopton-Weiss is seeking is money that the insurance companies deducted from the bills, either because the rates were increased without consent, or because in reviewing the bills, efforts were noted as being duplicative or unnecessary. As far as the Nestor firm, the Nestor firm was not involved in defending those suits. The Nestor firm only represented Fairchild in this declaratory judgment. The attorneys would ignore Fairchild's bankruptcy procedure, and that's not appropriate. When Fairchild filed bankruptcy, all of his property became property of the bankruptcy estate, under Section 541 of the Bankruptcy Code, and that included Fairchild's rights under these insurance policies. They also deny being subject to the bankruptcy court's jurisdiction, but a bankruptcy proceeding is an in-rem case. It is against the world. The bankruptcy court's jurisdiction is broad, and it reached to these insurance policies, and that is why the second settlement agreement, which allowed the plaintiff's underlying cases to be settled, required the bankruptcy court's approval. That's the whole point of bankruptcy, to marshal a debtor's assets, so that the bankruptcy court can determine where assets should go. Before Fairchild filed bankruptcy, its assets were subject to whoever could come along. But once Fairchild filed bankruptcy, only the bankruptcy court could prove where those assets should go. Petitioners come in and say, wait a minute, we want to reach into that pocket. We want to grab some of those assets. But that turns bankruptcy law on its head. How is the bankruptcy court supposed to marshal assets if an attorney can come in and enforce a lien against the settlement that the bankruptcy court has approved that says there are no fees, where the settlement agreement says there are no attorney's liens, where Fairchild, through its liquidating trustee, said, my attorneys don't get paid for this. There were no payments to these attorney's clients. There was no payment to Fairchild. There has to be a payment to the attorney's client for a lien to attach. There was no payment. The payments went to the attorneys, to the defense efforts, and to the plaintiffs to settle the underlying claims. They were not hired to enforce the claim. Chopin-Weiss was hired to defend claims. Nestor Consens was hired to seek a declaratory judgment. But there was a monetary claim paid to Fairchild. Finally, there was no proof of reasonableness. Reasonableness is an element. It's not just something we'll figure out later if there's liability. It's an element of the lien. Reasonableness was the reason the insurance companies didn't pay the bill in full. Reasonableness was the reason they're here today, because their bills were unreasonable. The fees that were reasonable were paid. The increased rates and the duplicative efforts were not. The circuit court held no factual hearing as to whether the fees were reasonable. The attorneys also argued that they were a type of inequitable lien. There was no proof submitted or even alleged in the petition as to the elements of an equitable lien. There's no proof of any agreement to sign any part of a rest which is required for such a lien. There's no proof of any equitable sign which is required under the Bagger v. Arnold case. There was no recovery to Fairchild which would be required for such a lien. There was no connection between Fairchild's obligation to pay his attorneys for DJ action and the money that was paid to settle the underlying claims. And there was a waiver in the settling agreement of the very liens that we're talking about. Your Honor, if you have any questions, I'll go back to you. Thank you, Your Honor.  Counsel? Thank you, Your Honor. My name is Peter Bagger. I'm an attorney at Schauff & Weiss Law Firm. David Nestor will be speaking at the end of my remarks. This is the second time this case has been heared.     The fifth time was in 2017. The sixth time was in 2018. I'm sure you may even have some recollection about the visit of now about four years ago on a foreign land convenience argument in which these defendants wanted to resist the proceeding that had just begun then in St. Clair County. The case came up here and the court's decision in the record was that we should stay in St. Clair County. But the litigation itself goes far beyond that, unfortunately. As counsel said, agreements should mean something. And in this instance, Fairchild Corporation purchased insurance from, over the years, eight or more insurance companies for a 40-year period and paid premiums. And then they sold off one of their divisions, a manufacturing division that made this Profiler hand-sander machine. They sold that off in 1996. And in 2004 and 2005, suits began to appear in southern Illinois and Kentucky and Indiana and Missouri from individuals who used these sanders over the years and had developed arm problems, pain and other physical and ultimately neurological problems as well. It was a large group. There were first three suits in Missouri. Those were collected in state court in Missouri before a single judge. But they operated independently for a while. And then a succession of federal actions, which the multi-district litigation panel gathered before Judge Murphy in the southern district of Illinois for 50, I believe it was 55 plaintiffs. From the four different states. So that underlined very significant product liability action was proceeding. And Schauff and Weiss was retained by Fairchild to defend that case, exactly as counsel has said. We dove into the case. And along with that, however, notices went out to the various insurance companies. And as I say, there were a lot of insurance companies here, eight to be specific. And trying to get the insurance companies to respond to their duties under their agreements, the insurance agreements of many years, was a very difficult and long process, which we're not finished with to this day. Trying to herd them together and to get them to come to some agreement amongst themselves on how the defense of this product liability case would be handled was very difficult and was never resolved. And as I say, it has not been resolved to this day, which is why we're here collectively seeking $205,000 in unpaid attorney's fees. Now, as the underlying litigation in federal court on the product liability cases developed, there were defenses we attempted to assert, particularly with respect to statute of limitations. These men had used the machines for many years. And so we thought we had good statute defenses. It was different for each of the four states, of course, because the limitations periods were different. And there were assumption of risk defenses, all of which went to the testimony of those individuals and their treating physicians and their employers. So there were 100 depositions taken in this case, actually a little bit more than that, of the underlying profile of plaintiffs, of their employers, of expert witnesses on behalf of the plaintiffs, and expectations on the plaintiffs' side were high. So we put a tremendous amount of effort into defending this case and worked hard on it. We went through some substantial mediations through an organization in St. Louis in which we had a full-day, almost a jury presentation to a deputation of these plaintiffs. As this was proceeding, the legal charges were mounting. Insurance companies paid some of those fees, but every bill that went out, some of them would late pay, they would not pay, they would take a holiday, they would cross out. It was a struggle all the way along. So as the case developed, we decided we needed to file attorney's liens. There's a statute in Illinois, as you know, the Attorney's Lien Statute, Chapter 770, that provides help to attorneys who are trying to do the work that they need to for their clients and also make sure that they're going to get paid. So both Schauff and Weiss in late 2008, yes, late 2008, and Constance in early 2009 filed Notice of Attorney's Lien. Now, the statute is a very broad one. It is one of the three bases on which Judge McGlynn held that our fees should be paid. Those were summary judgment against National Union, an equitable lien claim, an equitable attorney's lien claim, and the statutory claim. And I'll take the first two of those very briefly since there wasn't much argument about that. As to the summary judgment, National Union even today says there's no argument that they were responsible for paying defense costs. And we know that they have paid at least a portion of the indemnity costs, and that has been taken care of. So when this came to the circuit court on summary judgment, there were really no issues, including no legal issues, except for the fact that National Union didn't believe it was responsible for all the bills that had been rendered to it. That wasn't enough. Summary judgment was entered in one of the grounds on which Fairchild should recover, and what they would recover as attorney's fees is that summary judgment, which counsel for National Union doesn't really dispute. Second ground is the equitable lien. And an equitable lien is one that arises without necessarily having a direct contract or without having filed one of these notices of attorney's lien. And in this instance, that arises because Fairchild's general counsel wrote, this is in the record, wrote to all the insurers and said, you are to make your payments for attorney's fees directly to the lawyers representing us in this product liability action, Schauff and Weiss and a predecessor counsel in southern Illinois. He sent that out for years. All payments were made on attorney's fees directly to Schauff and Weiss. And as we pointed out in our briefs, there is nothing in the opening briefs in this court in which either of the defendants disputes the equitable lien having arisen. And the consequence of the equitable lien is the attorney's fees incurred should be paid. Here is the statutory lien. Now, the court is familiar with the statute, I'm sure, generally. It is a very broad statute and broad in its language. The lien applies, and I'm reading here, to all claims, demands, and causes of actions, including all claims for unliquidated damages placed in the hands by the clients for suit or collection or upon which suit or action has been instituted. That's exactly what we ask for here. We were hired first by Fairchild to represent it in the product liability cases. And then we were hired by Fairchild to file the coverage action in St. Clair County, the state court where the federal action was proceeding. And we did that. And Master and Constance was brought in along with us by Fairchild because it had claims against its insurers. And that's what we have prosecuted. That's what we're prosecuting to this day. So, there is a lien on claims. The claims are Fairchild's against its insurers. Not Fairchild's against some profiler plaintiff, but against its insurers in a pending lawsuit, the one that is on appeal here. Next, the statute says to enforce such lien, such attorneys shall serve notice in writing which service may be made by registered or certified mail upon the party against whom their clients may have had such suits, claims, or causes of actions. So, what Master and Constance and Chauvin Weiss did in late 2008 was to serve notices of attorneys' liens on the insurers. Not just these two insurance because the purpose of the attorney's lien statute is to put a lien out there and to put all parties that may be paying out money either to the to the company whose attorneys have filed the lien. They're paying it to them or for their benefit. And it's to put them on notice so they know that if they take action to resolve a claim, they certainly are are enabled to do that but they have to then take into account and take care of the attorney's liens in one fashion or another. They have to pay them or they have to get them compromised or they have to get them resolved. That's the purpose of putting them on notice. So we did that. And the notice itself that we sent out is itself termed very broadly. It is a lien on all suits, claims, demands, and or causes of action. And it's for the party against its clients whom its clients may have a suit against the insurance companies. Such lien this concludes this is the text of the lien such lien shall hereby attach to any verdict, judgment, order, or decree entered and to any money, property, settlement, consideration, or benefit of any kind or amount which may be recovered by or on behalf of or conveyed to plaintiffs on account of such suits. So what happened here is exactly what the attorney's lien statute is set up to protect against. We served the liens in late 08, early 09. Years later the ultimate liability to the profile to DME our third party plaintiff and the profiling plaintiffs gets resolved and the insurance companies collectively pay a million dollars into the DME bankruptcy in order to satisfy those claims. That is a very significant payment on behalf of Fairchild. Obviously that benefits Fairchild. That's why we filed a coverage action in the first place to try to win both defense costs and indemnification and that took care of the indemnification piece. That million dollars directly benefited Fairchild by paying one of its claims. As this court has determined in the case involving Walmart  years ago payments made on behalf of the lawyer's client are deemed to be payments against which the lien or to which the lien attaches. The case that I am talking about is the case that was decided here in 1999 Lefebvre Zeeman versus Walmart. Walmart declined to make benefits payments on behalf of one of its employees. The employee hired a lawyer. The lawyer filed a suit against Walmart. At the end of that suit or in the case of Lefebvre Zeeman the employee was not entitled to any payment. The court disagreed with that and said in Walmart's cross appeal they state that since Schmidt never personally received any money from Walmart there was no money for the attorney's lien to attach to. It is clear that the Illinois Act states that the attorney's lien shall attach to any money property that may be recovered on account of such suits, claims, demands, and causes of action. It is clear that if Schmidt's benefits had not been paid by Schmidt and Walmart acted at its peril when it paid the benefits directly to the providers instead of honoring the law group's attorney's lien. And there are a number of cases. The Illinois Supreme Court case having to do with Phillips Morris when the court found that the court had properly filed an attorney's       we sought to enforce it as the statute requires, we sought to enforce it as the statute requires, we sought to enforce it as the statute directs with a petition in the circuit court and that the insurance companies by paying the settlement amount of a million dollars out without taking care of the liens did so at its peril. As I say, the Supreme Court case is the latest on that but there are many of the same sort. Now, we're told that there were several different settlements that supposedly exonerate these defendants and yet there wasn't a single record reference at least that I remember in either of the presentations that you heard this morning. In the briefs, there were no signed settlement agreements amongst anyone. It is true that we actually worked hard to try to get the insurance companies to come together and agree amongst themselves on some allocation that was satisfactory to them that would also get Fairchild to pay its defense costs and a guarantee on the indemnity costs being paid. Obviously, that  been a good thing for Fairchild if it had occurred but it never occurred. There was a draft agreement signed by Fairchild. Fairchild was in charge of the agreement as a listing of the eight insurance companies, each of whose agreement was dependent upon all the insurance companies signing. That was one of the fundamental problems in trying to manage this case from the outset that the insurance companies themselves were jockeying for who was responsible for how much or how they were going to divide those costs. So that settlement agreement never got signed up. It was never put into effect and it was never acted upon by the defendants here or their co- insurance companies. That's why there's still $200,000 in attorneys fees owed. There was also another settlement, and these get a little confusing, particularly as elided by the defendants and the appellants here. There was a settlement with DME, the third party plaintiff in the product liability cases and the profiler plaintiffs, and that was one which took place in the DME bankruptcy, which Schauff and Weiss was not part of at all. There is nothing in the record that shows that any order of the bankruptcy court deprived the attorneys here of their liens. If I can just make one final point and then Mr. Nester will conclude. The reasonableness of the fees was before Judge McGlynn. There are over 450 pages of bills that are in the record for him and each month those bills went to the insurance companies and to their lawyers. They are entirely reasonable and this is now the sixth year or seventh year of our attempt to collect those fees. Thank you. Thank you for this opportunity. The last time I was given a couple of minutes to speak was by my wife and I lost that argument so we're not going to bring that up. Mr. Bonner completely told you about the position of Nestor and Constance just so the court understands what the position is of Nestor and Constance. Mr. Bonner talked about the profile of litigation, how Fairchild hired Shop and Wise to be involved in that litigation. I was hired as a lawyer and under an insurance policy, this is one of the oldest concepts going way back in insurance law, when you buy a policy of insurance, not only is there a duty to defend and a duty to indemnify, part of that duty to defend and indemnify is to pay attorney fees to Shop and Wise. Therefore, I was contacted by Peter and to prosecute declaratory judgment action in St. Clair County and also to prosecute petition to enforce liens in St. Clair County. I was not involved in the profile of litigation. I was involved in the declaratory judgment   reason the declaratory judgment action was brought was because attorney fees weren't paid under the duty to defend and the duty to indemnify. Once the declaratory judgment action started, we were fought hand and tooth the whole way. No one came to us and said we object to your reasonableness. They filed a forum motion. We came up here and we won. We went back. We had other motions and other discoveries. It never was resolved with Shop and Wise. Then the matter was saved because Fairchild filed bankruptcy. There's this whole issue as to bankruptcy. All I know is once the bankruptcy stayed this action, Shop and Wise and Western Constance filed a valid attorney lien. Pursuant to the lien statute in Illinois, we filed a valid lien. Once that valid lien was filed, all I know is that that lien was not ever valid. That lien was never perfected as far as payment of  loan. And what they did was they went and settled the profile litigation. Western Constance was never given notice that the litigation was being settled. Western Constance was never involved in any settlement agreements. Western Constance was never given any, not one letter to Western Constance that said anything about we're going to take care of your lien. A lien was not filed with Fairchild in the bankruptcy action. The bankruptcy action was with Fairchild and Fairchild's asset. The lien was filed with the two insurance companies, Arrowwood and National Union. National Union and Arrowwood never, they never honored those liens and to the state Western Constance has never been paid one dime for     appreciate the time. Thank you counsel. Your Honor, unlike the Walden case, the Walden case, the Walden case, the  case, Fairchild did not recover anything in any of these cases. There was nothing to Fairchild's  The underlying profile litigation was settled and the payments were made to compensate those plaintiffs for their injuries. With respect to the issues that were going to be allocated, the defense costs were paid. There were deductions made with respect to what was considered to be reasonable and necessary. In the 450 pages of bills that have been submitted to the court, there's no identification of what of those invoices remains outstanding, what constitutes the $200,000 that Shoffman Weiss is seeking before this court. Payments were made on those invoices and the disputes as to what was still owed was resolved directly with Shoffman Weiss. With respect to the opening briefs, not addressing the equitable liens, they addressed the liens from both perspectives. This is not a case where a client received a benefit to the detriment of their attorneys. The attorneys here were paid for the work they did in defending fair child rights. Any else? First of all, as to the settlement agreements, there were two settlement agreements. The first one resolved the defense obligation and the second the indemnity. That first defense settlement agreement, Fairchild did sign and the signature page is at page 552 of the record. So Fairchild signed and in that agreement it was agreed that the insurance companies would bear what share and Fairchild and its agents agreed that those obligations were settled, not jointly settled, so that each insurance company would bear its own share and would not be responsible for another. As far as the Wal-Mart case, one of the things that the Wal-Mart case says is that when that plaintiff hired that lawyer on a contingency fee basis, she knew that part of her recovery, which would equal the amount of her outstanding medical bills, would be cut off to pay her contingency fee. So that even if she wanted all that she was entitled to, she would still have to reach in her own pocket to pay a portion of those medical bills. So that when the court said to Wal-Mart, when you paid the provider, you should have held back a portion for the plaintiff's attorney, that doesn't apply here because the indemnity payments didn't go to someone that Fairchild understood they would still have to reach out and pay them. It was the indemnity to the plaintiff's and those plaintiffs, unlike the plaintiff in Wal-Mart, those profiler plaintiffs did not understand that a portion of their recovery would go to Fairchild's attorneys. The petitioners contend that they filed a proper lien. A lien against what? Where is the claim of Fairchild? Where is the money paid to Fairchild? The money was paid to Shopkin Weiss and to the underlying plaintiffs. They reported their notice, but the notice cannot exceed the statute's scope. And the claim that was resolved was not their client's claim. On the waiver issue, we did not weigh the equitable lien argument. As my co-counsel said, it was addressed and that issue was reviewed by the plaintiffs. Mr. Brower referred to this case. This case is not the underlying profile of cases in which the payments were made to the plaintiffs. This case is the declaratory judgment act. The insurance companies did honor their commitment. They paid defense costs as agreed in the first settlement agreement. They paid the plaintiffs. They dissolved the indemnity obligation, paid the plaintiffs   the    agreed.   did not pay the insurance companies as agreed. The plaintiffs did not pay the insurance companies as agreed. The          The plaintiffs did not pay the insurance companies as agreed. The plaintiffs did not